No. 23-2598. And we'll begin with you, Mr. Feigenbaum. Chairman Feigenbaum, for the State, I'd like to reserve four minutes for rebuttal. Granted. May it please the Court. The Supremacy Clause puts Congress in the driver's seat, and if it wanted, Congress could preempt AB 5207 tomorrow. But because the text and structure of Section 1231G provides unusually weak support for traditional preemption, CoreCivic is forced to first contend that it has a freestanding immunity from the Constitution itself. But there are only two forms of intergovernmental immunity, direct regulation of the United States and discrimination against the United States and its contractors. The District Court relied on the direct regulation prong, but as the North Dakota Plurality explained, direct immunity only forbids application of laws to the United States itself. That's plurality. It's not a majority. It doesn't bind us. Why should we be persuaded by it? So I have two reasons. First, I think it has the better reading of the precedent. I think Pendere's, which is a majority opinion that it quotes from heavily in the plurality, says all the same things the plurality opinion does. And I think it's a better reading of the opinions like Washington and Treasurer that talk about direct or discriminatory. But I also find it much more persuasive in the 4-4 disagreement that the courts have. But Pendere's observed that there was no prohibition that was placed on the federal government. And here, the words of the United States or federal government or even DHS aren't appearing in statute, but this is a marketplace where there is now reduced to a single seller of the commodity in question, and it is a single buyer. So by prohibiting that seller from entering into contracts, how is this in effect any different than a direct regulation? So it's obviously an extremely important question. I want to talk about it both as direct and as discrimination for a second because I think there's an element of both in the briefing from especially the United States. So on the direct question, this was actually true in North Dakota as well, and I realize the plurality opinion, so I'll talk about why I think it's right. But in North Dakota, that was a law only about alcohol sales to a federal enclave. That was the only possible buyer because there were separate laws for non-federal enclaves. And that's our submission for what we have here, too. It's true. This law talks about immigration detention in particular. But the backdrop, as we understand it, and we can get into the state law questions at the podium today, but the backdrop as we read our law is that we'd already disallowed it for all state criminal detention. And so it was just extending that prohibition to another context. So in North Dakota, the court says, okay, sure, these are only about sales to a federal enclave, but we have to decide does it fit in any bucket, direct regulation or discrimination. On direct regulation, it said, this is regulating the suppliers, not the United States. And because the subject is the suppliers, that's the constitutionally relevant difference. That accounts for the Seventh Circuit's decision. Fine. A limitation on the state. And part of this bill says, okay, New Jersey chooses not to and its subordinate entities. That's fine. But then you turn around and say, oh, but this is really just a regulation of private entities. If it really, because of our concern about private prison conditions, we can't credit that, because the bill does more than that. The bill says also the state is not going to contract with them. So isn't it evident, unless you think the law is we have to be completely formalist, functionally, isn't it evident that what they're really trying to do is to shut down immigration detention in New Jersey? So I have two responses to that, both on a formal answer and on a functional answer. So if I could give the functional answer first, although I don't want to lose the importance of the formalism. Give us the formal, because I want to come back to the functional. Oh, you want to start with the formal? Yeah. Great. Happy to. So for the formal answer, I think it's important to note two things. One, it would be a very strange result if the presence of subsection one meant that subsection two was invalid, even if it survived a traditional comparator analysis, because that would suggest we could repass the private subsection, as distinct from the county subsection, the next day in its own law, and that would be valid. I think that would be a sort of strange result for intergovernmental immunity, which is why intergovernmental immunity has never been this sort of undifferentiated, what do we think the legislature really meant to be doing here, and is instead, as Dawson versus Steger explained, a specific comparator analysis. You look at what's regulated, you look at the nonfederal comparators, and you decide if the federal contractors are being treated worse off. And our submission here is that when you do a traditional comparator analysis, and the closest thing you'd find, I think, is state criminal detention, we don't allow that either. And so CoreCivic is no worse off in providing federal immigration detention in New Jersey than it is state criminal, and so discrimination as an argument collapses. Isn't that fundamentally different than all of the comparator kinds of cases we look at? I mean, this isn't a general commodity like liquor or milk. This is a federal function. And here the state has the right, arguably, to opt out, essentially disqualifying itself as a comparator. So how does this really map on to the other comparator cases? I don't mean the comparator as whether our county facilities do immigration detention. I mean the comparator whether the state allows private detention for state criminal detention. And that comparator works because the United States and CoreCivic want to define immigration detention as the market. But private detention is a market that goes well beyond immigration, and there are states that use private detention contracts. But New Jersey doesn't use it for itself. And the basic idea of the discrimination analysis is that the state's going to have to eat its own medicine if the federal government's contractors are going to have a certain kind of burden, and that's how you protect the federal government. But that's New Jersey's prerogative as a separate sovereign, right? I mean, New Jersey can make that choice, but that choice is being taken away from the federal government. So I take the point, and I'll say two things about that, and I point to the plurality of opinions footnote 8 in North Dakota. When figuring out what choices can or cannot be taken away from the federal government in that way, the sort of burdens that the law disallows, the plurality explains that there are two different ways to assess burden, because otherwise you're going to have this kind of undifferentiated, unadministerable, does the court think it's too much. One is you look for discrimination, which is the comparator analysis we're talking about, and one is whatever burdens Congress thinks is too much. What's weird about I think a lot in this case is that Congress could just step in and say these burdens are too much. It is important that DHS be able to make this choice, and when it makes that choice, that contractor is free from any burdens under state law. But what's strange here is in intergovernmental immunity we're saying even if Congress didn't make that choice, even if they don't have a good preemption argument, we are going to imply it directly from the Constitution itself. That's a pretty strange way to think about how to deal with competing burdens on private and state, which really is the classic stuff of preemption. If we could go back to Judge Bevis' question about the function here. As I understand it, there's four detention facilities prior to this law, 5207, in New Jersey. You had service – well, you could have service processing centers owned by ICE. I don't think there are any. There are contract detention facilities owned by private entities. Of course, Civic is one. There's intergovernmental service agreements between ICE and state and local governments. I think there were two counties, Essex and Hudson. And then you had the interagency agreements between ICE and federal detention facilities. And I think that U.S. Marshals had some type of agreement with one of the counties. Is that correct? That's my understanding. Bergen County? That's my understanding. So after this law, the counties are out. So it loses you two. CoreCivic private detention facility is out. That loses you three. And did Bergen County terminate its contract with the U.S. Marshals Service? My understanding, the United States obviously can correct me, is that CoreCivic is the only remaining immigration detention facility. So basically, without CoreCivic, you're down to zero. And the next closest, there's one in Orange County that's inadequate, more than an hour away, 60, 70 miles from New York Airport. So then you have to go out to Mohannan, which is four hours and 17 minutes away. It's out by Altoona. Now, you can't deny that's a substantial interference with the federal government. Are you, in essence, reading the substantial interference prong out of intergovernmental immunity here? I don't think so. So I want to be clear about substantial interference with what for a second, because I think that really matters. There's two ways to think about substantial interference. Substantial interference with how the executive has been running its program, and substantial interference with the choices that Congress has made in the text and structure of the law that it's adopted. And what North Dakota says, and I think Washington and Penn Dairy's and other cases reflect this, is the way we identify substantial interference is we look for direct regulation or discrimination, or we look at the kind of burdens Congress found intolerable. Okay, so McCulloch has no independent role. It's just a historical relic that we teach to law students that isn't good law anymore. I don't think so at all, Your Honor. I think McCulloch is truly the touchstone in this space, and I think that Washington and I think that North Dakota explain McCulloch quite well, which is what the interference was. You know, the power to tax is the power to destroy, very famous. The point of what they were saying there is federal law is supreme. Federal law created this agency. You can't destroy the agency because then federal law wouldn't be supreme. But that's really important here. Federal law is supreme, which means preemption, or it means agencies created by federal law. I don't know where in the text of the Constitution a private party gets a freestanding immunity from neutral state laws. That's where I have such a hard time. Preemption is the way. Federal law is supreme. Preemption. Preemption is the way you decide what burdens are intolerable. And there's no statute that we were talking about here that says there has to be private detention in New Jersey. New Jersey law can't apply to it. Going to the Monaghan Servicing Processing Center is too difficult. So Fresno extends the power to tax of the McCulloch, and Fresno upholds a tax, but it upholds it. Footnote 11 stresses the neutral tax. Neutral, not just the federal government, does not threaten to obstruct or burden the federal function, such as by making the federal government unable to hire anyone. That sounds like this case. Sort of. So I would say a couple of things to that, Your Honor. The first thing I would say about Fresno and kind of that way of thinking generally is I think it's actually quite helpful to my side of the V in this case because it shows very clearly that although this case is about a contracting partner, direct regulation in who gets covered and who doesn't get covered has implications for regulatory laws, has implications for tax laws, has implications for the minimum wage laws, use of solitary confinement. And so I wonder, of course, if in a future case it's going to say you're taxing us too high as a federal contractor, and it would now be direct regulation. And that's how we'd have to test burden. The way our law has decided to look for that substantial interference, given the nature of the Supremacy Clause itself, which again talks about federal laws being supreme, is to look at what is an obstacle to Congress's laws. So what we're talking about in colloquies this morning is what has been an obstacle, as it were, to the way ICE has been running itself for some time in New Jersey. There's no reason ICE couldn't buy the Elizabeth Detention Center or lease the Elizabeth Detention Center and run immigration detention itself. There's no reason it couldn't work with DOP, whether to do training or, as Judge Ambrose noted, other forms of arraignment. Okay, so in essence what you're saying is there used to be four ways they could run an immigration facility. We've closed off two of them, but there are still two other ways they can do it. They can build it themselves, or they can lease the facility and then do it themselves. But it's okay to close off these other two. That's not substantial interference, even if your friends on the other side are going to stand up and say, we don't want to. We need the flexibility of private providers and leased facilities, et cetera. But we still shouldn't view that as substantial interference. Yeah, so we keep saying the federal government, and I want to tease that out for a second because I think it matters here. Federal government is obviously the courts, but as relevant here, Congress and the executive. And what we keep talking about is the executive's detention preferences. If Congress had said there's a private right to provide detention for a company like CoreCivic, this is an easy case. And they could go to Congress and ask for that sort of thing. Because the way our law handles competing burdens on private interests is by letting Congress make that choice. And what's missing here in all of these colloquies is the discussion of executive preferences. We already talked about 1231G because I think it's such a weak form of preemption. Go look for what's available, and if nothing's available, go build your own facility. And so I don't think because preemptions are weak, we need to find it in the Constitution. The answer is to go back to Congress and ask for a stronger form of preemption if Congress thinks there's substantial interference. And that's sort of the through line of cases, I think, like New Mexico and Penderes and the North Dakota plurality. And I think that's a good rule for the reasons New Mexico gives, which is that Congress has institutionally superior capacity to make policy calls about competing burdens between state laws on its view on what private detention is appropriate in its borders and federal policy views on what's appropriate for immigration detention. Let me ask you some hypos. Your position, are you implying that the U.S. Mint could ban a private contractor from setting up a printing press for dollar bills or a mint for quarters in New Jersey because the incidence is not direct regulation of the U.S., it's just a mint contractor? Sorry, if a state could do it? A state could do that, yes. A state could ban someone from printing a form of money? Isn't that an implication of your position? If the feds wanted to contract this out and New Jersey said not in New Jersey, you don't? Yeah, I mean, it would depend on what the law – one of the tricky things with some of these hypos, just to warn you in advance, is I would need to know what the statutes say about money printing and the U.S. Mint and things like that. It's very easy to get preemption for federal contractors. That's one of the things that's kind of funny in this case. I think Leslie Miller and PUC are really good examples. I think a lot of these examples will ultimately be knocked out by preemption. But I don't really know what the law says. But you would say intergovernmental immunity does not reach that law. This is a preemption situation. Yeah, I would say direct regulation doesn't reach that law. If the way the law is written is just no one can print currency, no one can print currency for anyone at any time, then yeah, I think it would be preemption. And the same thing for building munitions during peacetime. Again, if they hired a defense contractor, that would not be intergovernmental immunity. Yeah, my understanding of cases that have sprouted in the military space is really it's quite often preemption, so there isn't a lot of cutting in this case. But I will say just really quickly on that, Judge Bibas, because I think it goes to IGI, is I think you could easily find a world in which some of these actions are going to be discriminatory. You need to do a comparator analysis and decide what you do or don't disallow. Jeff, if it's a market like this one of printing currency or building federal defense weapons, no one else is allowed to have nuclear warheads or something like that. Your vision of discrimination, because there can't be a comparator, it can't flunk the discrimination problem. No, no, no, that's not what I'm saying. I think that's actually weirdly what the United States is saying here, that because they alone do immigration, it's necessarily discriminatory. That's not what we're saying at all. We're saying it's like a class of one equal protection. It might be harder. It's harder to make a case when you have a class of one equal protection. It's definitely not easier when you say you have a class of one equal protection, but you do your best effort at finding a comparator. We don't think immigration detention is a relevant market. We think detention services are a relevant market, private detention services. We've done our comparator analysis, and New Jersey disallows it. It's the Essex County case that my friends on the other side brought up in their briefing that I think is quite helpful. It says, this is our appellate division, our intermediate appellate court. It says, we think detention is a core government function that locals cannot delegate to private companies absent authorization from the legislature, and we don't see authorization from the legislature here. I think that's pretty clear from the sort of halfway house laws, as I'll call them, 91.9 and 91.10, where they're specifically allowing specialized community residential halfway houses. And in that setting, both as a matter of surplusage and as a matter of expressio unias, it's pretty clear that by having special laws allowing halfway houses, there wasn't a backdrop of allowing general criminal detention. Let's talk about, it seems like you want to push all of this over into preemption now. I don't know if my colleagues want to talk about it. Okay, but if we're in preemption land, this case, why is this case not like Leslie Miller, PUC, and especially Crosby? I mean, these are cases where, you know, they're barring some kinds of contracting. So why is this case distinguishable from all of those? Yeah, it's a level of generality problem. You could just, like the Ninth Circuit did, you could sort of look at them and say, these are contractor cases, and so any- You agree. You're asking us to split from the Ninth Circuit. I do. I definitely think the courts should diverge from the Ninth Circuit. I will say, on methodology, I think the Seventh Circuit has already done a fair bit of work. McHenry is different. I'm not saying it's identical. There are key differences between McHenry and this, but in its statutory analysis of 1231G, I think its reasoning is quite helpful for us in what it says there is and isn't coming out of that federal statute. And so I'd say the most obvious difference, Judge Buvas, is that I think there are cases like Arizona, like Crosby, like Leslie Miller, and like PUC, where there's such an obvious, like comprehensive, articulated scheme that it implies you don't have to be subject to any other rights or burdens. And that's how Garcia has construed Arizona and talked about it that way. I think Crosby makes sense in the same vein. Leslie Miller, PUC. So you're going to have cases like that, which takes care- This is why I bring up preemption. It takes care of a number of the burdens we're worried about. So you want to say there's not enough in the INA, but under the INA, without this law, this law does not affect the federal government's ability to say, hey, CoreCivic, we'd like to contract with you, okay? Cleverly written not to say that. But it does say, okay, the federal government is making this offer. We could have accepted it before this law. We have a right to accept it before this law. We can no longer accept the federal government's offer. So there was a right, and this is a disability that takes away that right or abridges that right. Why is that not enough for obstacle preemption? Yeah, let me do that as preemption, and I think a bit of that had IGI again, that I think is worth throwing an issue on, if you'll indulge me. On preemption, I think it's not enough because the recent number of years, five, ten years from the U.S. Supreme Court make very clear when we're doing preemption, we're looking for the actual text and structure of the laws that Congress passed. And when you look at 1231G, which is the core statute that talks about how to find detention, and the only one that really references private detention, we can talk about the rags and the appropriations laws in a second, it is, I think, a particularly weak version of preemption because the instruction to the federal officials here is go, look for what's available, and if something's unavailable, construct. And it says look for what's available, buying or leasing private facilities, and then go construct. It's very hard to say that a law that makes something unavailable interferes with the statutory duty to look for what's available and build if nothing is. There's no requirement or right that something be available in the first place. That's always a question of state law and economics alike. And there's also no, in this case, preemption. Congress says maybe they'll be unavailable. It doesn't say we'll preempt anything at that point. It says go construct if you can't find anything, including if you can't find to buy and lease. Doesn't 1231G give to the federal government the discretion to make a judgment call as to what is appropriate? And we have a number of cases, some of which you're putting in the preemption column, like Leslie Miller, but arguably are in the intergovernmental immunity column, where that type of constraint on the discretion of the federal government, even in the case of the president where we're dealing with sanctions with Burma, for example, is considered to be substantial interference. When we have that backdrop of this discretion being given to make choices about detention, why shouldn't we look at that as substantial interference back to intergovernmental immunity? Yeah, I think it's an important question. Let me start with the preemption part, and then I appreciate you letting me take it back to immunity as well. On the preemption part, there are three different things that Congress could choose in a space like this. One, federal officials may not use private detention. Two, federal officials may use private detention. Three, federal officials may use private detention, irrespective of any state law disabilities on the private companies. And we're deciding between two and three. I do not dispute that federal officials have that discretion. What I do dispute is the idea that the fact of discretion automatically tells you if Congress chose that middle bucket or that last bucket on whether or not it's something you can do or something you can do regardless of state law. And I'll find that the word appropriate itself is kind of a little mushy in this space, but 1231G doesn't just say find appropriate places of detention. It says find appropriate places of retention, and here's our scheme for how to do it. Go look for what's available, including to look for federal facilities if they're available. Look to buy or lease private facilities if they're available. If unavailable, construct your own facilities. So it's sort of like how we're supposed to spend money. So they've said how they think you should go about doing the appropriate analysis, and it just really screams to me like that middle bucket. You're free to do this kind of contracting, but not in a way that preempts state laws on what's available in the first place, just given the text and structure of 1231 itself. But to your point about immunity, which I appreciate you letting me respond to, I guess I just wanted to say both a sort of legal formal and a functional set of reasons for why it doesn't make sense that we would be implying just when you have government discretion to contract that any limit on those contracts would be sort of void on its own from the Constitution. The first is I mentioned this earlier in a colloquy with Judge Bevis, but I think it bears repeating. There's nothing in the text or logic of the Constitution itself that would make that kind of immunity make any sense. So the reason McCulloch gives for direct regulation of the United States being a problem is twofold. One is federal law created these federal offices, so if you're able to destroy these federal offices, federal law is no longer supreme. That logic doesn't hold to private parties at all. Federal law didn't create those private parties at all. They are private parties, as Penderes and North Dakota put it. They are just subject to two sets of regulations by two different sovereigns in the same territory, the U.S. and New Jersey. And Congress did realize that there might – the framers did realize that there might be conflict and said Congress is the one to resolve them. It made federal law supreme. This is Whiting. This is Garcia. This is the recent number of cases from the Supreme Court. And so it said private parties exist either way. Preemption is the answer when you don't have discrimination. The second thing I'll say is this formalism matters to the logic of the Constitution, not just the text of the Supremacy Clause, because it's the inverse of Tenth Amendment anti-commandeering. The Tenth Amendment anti-commandeering doctrine very much cares if the United States has operated directly on a state or operates on a private party in a way that might interfere with what a state wants to do. The federal government can operate on private parties even if New Jersey doesn't like that. That's classic preemption. So sovereigns just don't get to regulate each other directly. But you're also disabling the inverse. I run that argument the other way. The inverse of this is you are disabling the federal government from doing this. Now, your response repeatedly has been, and it's a clever response, well, Congress could say that. But does Congress have to say that? Can the states throw up these roadblocks unless there's a specific authorization each time? There's some magic words they have to use. I appreciate the credit for the response. I will just say it comes from a number of cases. So I don't think I've invented it at the podium today. It comes from North Dakota. It comes from Bandera. And I think it works. I think it works. The reason it has to be that way is because that's what the Constitution chose in the text of the Supremacy Clause. And for four reasons, I think it makes sense as the right choice. The first is, as I noted, I think Congress has superior expertise on what burdens are appropriate and what burdens aren't. The second is that this fits with traditional federalism, which generally has powers. Again, I'm defining my market as private detention if we're accepting neutrality for the directness part of the analysis. States have power over private detention within their borders, so it's more respectful of states. There's also a risk of category error. If this court says there's no immunity, Congress can step in and fix that through preemption. If this court says there is immunity, there's nothing we can do. We can never regulate this product. Even if we have the most neutral law in the world, even if we have the strongest health and safety justifications, we can never regulate core civics decision once DHS offers to hire it to work with federal contracts. Judge Krause, I see my time is expiring. If I could finish the two other parts of that. You can, and you'll be on our time with questions that my colleagues and I may still have. Bear it up, Your Honor. So then the other two points I just wanted to make quickly is I genuinely don't see how the contrary rule is ultimately administrable. This was footnote 8 of North Dakota I was mentioning before. I get how you do discrimination analysis with comparators. I get how you do what burdens did Congress allow or disallow. I don't get how you do what burdens did the Constitution allow or disallow. My point is not that there are edge cases. I realize the other side says, sure, there's always edge cases in any doctrine. I spot them. I'm saying I don't know how you pick a standard or what the standard should be because you don't have a statute. You don't have discrimination. You're just implying it from the Constitution. I don't buy the disabling states from doing anything because neutral health and safety, the neutral taxes that aren't confiscatory, et cetera, still remain on the table. A ruling for core civic wouldn't prevent minimum wage, maximum hour, workplace conditions, those kinds of laws. So I agree with that, but I agree with that because I don't think it's direct regulation. This is a really important part of their argument that the district court correctly understood, but I know can get a little lost in the way AB5207 is written. A holding on direct very much applies to neutral laws. Direct regulation is an exemption from neutral laws. If the law is not neutral, you're asking whether it's discriminatory. But direct absolutely gets exemptions from neutral laws. So if we said no one may buy private detention, right, that side of the contract, the United States would absolutely have a winning claim that it is exempt from that law because we cannot apply a neutral state law to the United States directly. My submission is if you imagine that neutral law and we say no one may sell private detention to anyone, that's how we're defining the market, core civic doesn't get that sort of exemption because directness really does apply just as strongly to neutral laws as not neutral laws. And if we're bothered by something about immigration specifically, we have to fit that in the immigration, in the discrimination framework. And there I would just go back to North Dakota, which says you don't look at laws in isolation for figuring out the discrimination question. You look at laws in the corpus of state law. And seeing that way, we are regulating detention as a market, not just immigration detention. But the case before us is immigration detention with that single buyer. It's not a criminal detention case in front of us. So we do have that market. And you're saying that we should revert to being sort of hyper-formalist about it because as you point out, with the parties that are on either side of that transaction, the effect is identical to the state telling the federal government as to immigration facilities that it can't buy this commodity. It can't contract for private detention facilities. So if I could take a run at that premise for a second, I actually do think it matters to look at the law holistically and not just the law in front of you. And let me just give a hypothetical that explains this on two things I think have to be the same. If we passed a law that just said no state criminal detention and no federal immigration detention can involve private, like no private company can provide those things, all in one law, my submission is that is what we have. I mean, imagine you had a law. This is actually basically North Dakota in the way it did alcohol. Imagine you have a law that says no private detention unless you're selling to federal immigration. And then the second law was AB5201. The legislature came back and said, man, this exception really is a health and safety problem. We should have just done the whole market the first time versus a law that did it all at once together. I don't really see how those laws can come out differently when it comes to discrimination, and this is the point of a comparator analysis in a holistic interpretive exercise. Doing what I call law one and law two, two different times together, you've given the U.S. an exemption and you take it away, can't really be different than regulating everyone all at once at the end of the day. And that's North Dakota. North Dakota was a law only about alcohol sales to a federal enclave. Now, it was because North Dakota had given a broad exemption to that federal enclave from its preexisting state laws and ultimately carved back a bit on that exception with labeling requirements, et cetera. But that's our submission for what state law is. And then we have to get into a question of what state law is. But our submission is state law is a preexisting disallowance of private detention for anything analogous except it's had exceptions for the federal government. And what we're doing in AB 5207 is cutting back on those exemptions from the federal government, and it would make sense that AB 5207 would only focus on that because if you're concerned about the implications of entities like CoreCivic having custody over individuals' liberties just by having their private motive, their lack of small d democratic accountability, if you're concerned about that, that is the context in which it's happening in New Jersey. It's not happening with DOC. It's not happening with our counties because we don't allow it. That's Essex County. That's our statute. That's the Haley Declaration at JA 110. We don't allow any of that. So if you're nervous about it, this is what you have to go after. Let's go back to almost the dugout here. You've got, use a hypothetical of criminal detention, and a state does not have any federal facility that's owned by the government, and then the state passes a law similar to what you have here that no one can contract for a criminal detention facility. So you're going to have nothing in your state. How would you go about analyzing that from the get-go? In other words, let's say you're the judge. They're bringing it to you. How would you prefer or suggest that a court go about it? I'll just give you an example. In GAO, the Ninth Circuit starts with, it's all the supremacy clause. It starts with intergovernmental immunity, then goes to preemption, whereas the county situation that you had in McKenna County, it starts with preemption and goes to intergovernmental immunity. How would you analyze it? Yeah, so we obviously briefed it first as immunity and then preemption, because you're figuring out, do you have to figure out what the statute is? Well, the district court didn't decide preemption. Oh, no, I think the district court, to have disagreed, not on discrimination, but to disagree, I think the district court kind of merges the two a little bit. I think that's one of the errors the Ninth Circuit makes and the district court makes, is to draw a little from one another. I know what you're saying. That gets into the nuance. But how would you go about it? Yeah, so I tend to think preemption is the easiest way to think about competing burdens on private parties. So I'd probably start with preemption's well established. It's a classic area of law. We definitely agree preemption exists. We definitely agree Congress could preempt this law. Let's see if Congress did. If I come to the conclusion that Congress did not preempt the law, I'm going to have to ask, well, does the Constitution do that work for it? And then I think that's, from our submission, you have to ask the direct in discrimination, because the basic submission is it's a big deal to say the supremacy clause of its own force knocks out a state law that Congress hasn't passed a law to knock out. It's a big deal to say immunity blocks it, notwithstanding the lack of preemption from the INA. And so that's one way I think about it. Now, to your example about for-profit detention in New Jersey, if we're hypothesizing that the United States has some interstate commerce based ban on restricting private detention services generally, I wouldn't think that's an anti-commandeering problem. It might be quite burdensome on the state of New Jersey if we lose access to private detention if we were using it. Again, in my hypothetical, obviously we aren't in New Jersey. But if we're using private detention and they, let's just, you might have a commerce clause challenge, but I think it's a marketplace. So they do commerce clause. They say no private detention. I don't think the fact it burdens us is an anti-commandeering problem. And so I just don't see why the inverse would be true on intergovernmental immunity. We're not regulating them. We're not discriminating against them. And yet it's so burdensome that it knocks out the law anyway. And so I think it's a fraught exercise in either direction of the V, state to federal or federal to state, to start asking, demanding, courts say, you figure out what the standard is and you start drawing the lines between what's too much of a burden on the executive of the federal government rather than a burden that Congress itself saw fit to disallow. In some cases like PSC, the court has taken account of the consequences of generalizing. So what happens here if every state does this? And is that an appropriate thing for us to take into account in viewing the level of interference with the court and exclusive federal function of housing non-citizens? I know, Judge Aziz. Can I say yes and no, but explain the yes part and the no part to your question? So on the yes part, I think it's fine to imagine all 50 did this. I'm not saying New Jersey has a special right to do this that New York doesn't have or Pennsylvania doesn't have. The no part I'm going to say is, I still don't think the actual question is how much it's going to interfere on a day-to-day basis with the way the executive currently chooses to run immigration. It would be a weird result for constitutional law if ICE's choice to have three ICE facilities in New Jersey versus zero made a difference to our regulation of a private party. It would make a huge practical difference to how much ICE would be affected in this case. I will spot you that. If ICE had three, if ICE had zero, it had zero here. I don't understand how a state's authority to regulate a private party could have, could rise or fall with how many public or private facilities ICE has chosen to use. But facts of the function here, doesn't the law also affect the counties that have now backed out? Absolutely. I don't mean to fight that at all. I was making a different point, which is the law would certainly allow ICE to have its own facilities, 1231G, because it could have them and what a practical impact this law will have on federal executive operations really rises or falls with ICE's own choice to do that or not. I mean, all over their obstacle preemption argument, they're saying it's an obstacle because we choose not to do that and we haven't done it for years. But executive policy choices or financial management choices just don't seem the sort of stuff that builds obstacle preemption to congressional law. If they need this, if they don't have. Let me piggyback if I may on Judge Krause's question. If you're dealing with preemption, we have a case from 1986 called the United States versus the city of  It was a preemption case dealing with military recruiters on campus. Can the Temple Law School do that? Later when that type of issue went before the Supreme Court in Fairview, Rumsfeld. And our court said that we reject the suggestion by the commission here, that was set up, the ACLU and the task force, that we should not consider the effect of the order of military recruiting. We believe that it is appropriate to consider the order's effect on military recruiting on Temple's campus generally, as well as its impact on military recruiting on other college and university campuses throughout the city and the possibility that other jurisdictions may adopt a similar interpretation with their anti-discrimination ordinances. So isn't Judge Krause exactly right that at some point, if functionally states follow the leader here of, well, follow New Jersey and Illinois, and you are left with the federal government only being able to buy and build, isn't that a major preemption problem? So this is more of the yes and no with apologies. So I think much of what you said fits in my yes part. I think it's fine for this court to imagine 50 states are doing this. I don't have an objection to that and to think about the effects. My main submission, depending on when we're talking about immunity, or whether we're talking about preemption, is that it's effects on what? And I think the U.S. Supreme Court's been- Well, it's effect on a core function of the government, having detention facilities for criminals or immigration detention. So I don't think that Congress has ever said a core function of the government is private detention for immigration. It certainly said it's allowed. I'm not fighting the idea they can use it. I just don't see anything that says you can use it and that must, therefore, trump any state restrictions on private entities. So you're saying that every state could say, not in my backyard. I'm saying that they can say that for private parties, and they can say it for their own facilities. And I'm saying Congress can say yes in your backyard in 10 seconds, if Congress wants to say that, because that's the classic way we deal with problematic competing burden on private parties. Congress is always free to make the choice. I think that's an important part of this case. Congress is totally free, instead of 1231, to say, go look for what's available, and any private company that wishes may make it available, if the economics work out or whatever. You don't even need that part of the phrase. Preemption, no problem. You don't even need the exact words, which hereby preempt state laws that restrict. I don't fight the idea there can be implied preemption, but it needs to be based on some sort of private right or some sort of private obligation, either expressed or implied from the text of the statute. And Judge Ambrose, that's where I'm really struggling, because I think 1231 is such a weak form of preemption, because it contemplates that there might be unavailable facilities, and it just doesn't say you have a right to make them available. It doesn't say you get to use preemption. It says you use construction at that point. So it might be a real problem for Congress, or Congress might say, honestly, we're a little sketchy about private companies doing this, now that we realize how many people. Then turn it around and make it, instead of preemption, if you make it intergovernmental immunity and you focus on the direct regulation of the government, in effect, functionally, isn't what's happening if all these states do this, not in my backyard. It's directly telling the government, you can only have a criminal or immigration detention facility in my state if you own the property and you build the darn thing. And staff it yourself. Yes, buy or build. Yeah, I don't want to quibble too much on the fact. Yes, you were taking out various pathways that ICE wants to use. I don't want to quibble on the exact things there. What I would say to that is twofold. First is, I still think there's a huge difference between direct regulation as I see it and the sort of burdensome regulation that we're talking about here. Direct regulation would let us actually, formally, stop immigration detention in the state of New Jersey. We can't do that. All we can do is take out, subject to Congress's choice, take out private parties from the marketplace of detention from doing that. And I think that's a big difference. I'll meet your 1980s case from the Third Circuit with a 1970s case from the Third Circuit. It's the Pennsylvania Hearing Board case from 1978. And it basically says federal government, when you choose to work with private contractors, you take the good with the bad. The good is you might get some cost savings. The bad is they're subject to state regulation unless Congress steps in. So I don't think that really is the same kind of burden intergovernmental immunity is talking about. And that's why in North Dakota, we could never have said, North Dakota could never have said, you military base can only buy alcohol with certain kinds of labeling. But they very much could say, you sellers to the military base, again, we're the only counterparty is the United States. You sellers to the military base need to satisfy our labeling requirements. I'm hearing your answers and thinking back to your response to Judge Bevis as to any role for substantial interference. And if you're essentially reading that out of intergovernmental immunity, in a sense, asking the federal courts to step away from any interpretation that would bring intergovernmental immunity as the basis for overturning a statute, as opposed to something clearly stated by Congress, where we have the backdrop of preemption being a higher and higher bar in the last decade of Supreme Court cases, isn't it particularly important for the federal courts to play a role in policing the supremacy clause? So two thoughts on that. First is, I just want to hug footnote eight again for a second from North Dakota, which I think is directly responsive to your concern. It says, we realize Justice Brennan in dissent, and it's 4-4, so the fact that the dissent doesn't take it out of the equation, but Justice Brennan in dissent says, oh, there's all these burdens that are going to follow. This is a real problem. And Justice Stevens says, no, the way we decide burdens, the way we assess substantial interference is what's right on the United States, what's discriminatory, or what did Congress disallow, and anything else puts federal courts in a terrible institutional spot where they don't have the sort of practical and policy roles that Congress has in making those decisions. So footnote eight joins issue and says, substantial interference, we get it, but this is how you find substantial interference. And to your point about preemption becoming a higher bar, I obviously agree. We've cited those cases in our brief. I do think it's a higher bar. I think it would be an odd response to, because the court had said, the supremacy clause really makes federal law supreme, so you really need to find it from Congress's laws, not from free-floating brooding federal interests, as McHenry puts it in the Seventh Circuit. Because we have a higher bar for what Congress did to preempt, super strange to therefore say the court actually has extra authority to block state laws when Congress didn't do it. So I actually think they should kind of go together, the tightening of preemption, all without Congress's authority, Congress's law, the text of the supremacy clause. It's a pretty good sign in my favor about intergovernmental immunity. Footnote eight talks about the word burdensome, and it's tough to measure it. But every now and then, reverting back to the 50s in another context, I know it when I see it. And if you are in effect having no facility in New Jersey that is useful for, can be used for immigration detention, and you only have the possibility of a long-term construction project, you are, in effect, burdening the government directly and forcing its hand to spend the monies, build the facility, and staff it. And so can't you say there, I know it when I see it? So let me give a quick factual response, and then let me do to the heart of your question on the factual response. I just want to reiterate, very much we think DHS could buy any facility or lease any facility and operate it. It doesn't have to build. I think that's a mistake. The district court misunderstood about our law in the record below. So we could just buy Elizabeth Detention Center tomorrow. Of course, if it operates it, it could operate it instead. I'm not saying that's not burdensome. I'm just saying I want to be precise about the facts here. On your I know it when I see it, I think that was kind of a tough experience for the court for some number of years to go through all of those cases and do the I know it when I see it. Well, they gave up in the 70s. They gave up. I mean, they gave up. So I think it's like a pretty good lesson that I know it when I see it. But every now and then, it's like functionally it's got to be, one could argue, that they've crossed the line. So I guess I would just meet that it's got to be with anything that's got to be is something Congress can say it's got to be, because it's just a little fraught for the court to dive in on the I know it when I see it line of reasoning, when there's an obvious answer to all of this, which was different actually than the First Amendment context where Congress couldn't just step in and solve some of those problems around obscenity. Here, the Supremacy Clause has a tailor-made solution. It's okay for Congress to say I know it when I see it. It's okay for them to make policy calls. It's okay for them to make practical judgments of what's too far. I know it when I see it for the federal courts. It's a really tough enterprise in a space that's so practical. So I know how this case might feel from some of the questions that have come up today, but I don't think it's that easy to draw that line. But what you end up with is it is directly regulating the government by forcing it to do it itself. Buy, build, staff. So isn't that regulating the government? I will just say I don't quite think that works, and this gets back to North Dakota again. I know that law feels different. It's labeling instead of a ban on private detention. I get it. But the record evidence there was that the company stopped selling to the base, and there was record evidence that the base was going to have to make its own alcohol if it wanted alcohol because they thought the labeling regulations were too burdensome. So the idea that someone coming out of the market because something's too burdensome, whether that's a ban or just a heavy regulation or a heavy tax, and they come out of the market and, therefore, the U.S. lost them as a partner, that's a pretty tough way to try to draw lines at the end of the day. And it gets back to the broader point I was making earlier to our colleague, Judge Ambrose, which is this court said in 1978, sometimes you take the good with the bad when you go to private contracting, and one of the bad for private contracting is they're subject to state laws. But that's federalism. We all know that private parties in New Jersey or New York or whatever state you want to say are subject to state laws and they're subject to federal laws. And the way you reconcile those burdens, as long as they're not discriminatory, is you reconcile them by ultimately saying what is Congress preempting, even if it's a high bar. So to be perfectly clear, if a statute does not meet the high threshold for obstacle preemption, your position is that the federal courts have no business doing an analysis of substantial interference with a federal function. I would quibble slightly with the framing. The business of identifying substantial interference is as their director of discriminatory regulation. I just hugged the way Justice Stevens said it, which is what it means to substantially interfere is to directly regulate because direct regulation is really different. If we could directly regulate the United States, we could just say no immigration detention in our borders. ICE couldn't do it itself, couldn't contract with BOP, couldn't buy the illicit detention facility. I mean, it is much further along, even if this one, because what they want to do is private detention, feels different. And then discrimination, which I think is an important limit. The state has to take its own medicine on the marketplace. So qualifying the question, other than meeting the bar for preemption and actually naming the federal government or agency, the federal courts should not be doing any substantial interference analysis for purposes of intergovernmental immunity. I'm going to say yes, other than discrimination, which the law has always defined discrimination to be a way to set out substantial interference, and North Dakota expresses this. But yes, other than direct discrimination and preemption, there isn't a separate free-floating interference. And if there was going to be that sea change in Supreme Court case law, wouldn't we expect Congress to, I'm sorry, wouldn't we expect the Supreme Court to have been more clear that it was making it? We have, back to McCullough, courts engaged in that analysis, looking at substantial interference with federal functions. Are you pinning everything on North Dakota? No. So I'm pinning it on three cases maybe, maybe a few others. So I think North Dakota just does a really nice job, which is why I hug it so much, of explaining the two perspectives on which tests to ultimately use. And so when you have a 4-4 split with a ninth justice just talking about alcohol regulation in the 21st Amendment, anyone's going to choose the other of a sea change because they're going to say the four properly understood the law as it is. I will say I find North Dakota's pluralities read quite persuasive because they cite a series of cases, some regulations, some tax. Pandari's a great example where multiple majority opinions made clear substantial interference equals direct or discriminatory or what burdens Congress said is too much. And I think Pandari's has all of that. The other thing I'll say is the Washington case itself, I realize it has that language about this is the part we all agree, but it is canvassing the history and saying there's been a lot of change as the years go on in the intergovernmental immunity doctrine. They use the word evolved. And so I think there were cases, not McCullough itself, which is totally easy to square with my view. I mean, it is a regulation of the Bank of the United States, power to create, can't be destroyed, et cetera. But what I would say there is there was an era that Washington acknowledges of saying, okay, well, too much interference, it's a problem. But that era, I mean, Pandari's is 1943, and it's saying what I'm saying at the podium today. And so I would just know that's, you know, 80 years. My math is not 82 years. It's not perfect. 82 years, yeah. So thank you, Judge Ambrose. So, you know, I think it's not. Well, of course, I know I'm not 80 yet. Touche. Thank you. Mr. Simon. Thank you, Your Honor. May it please the Court, my name is Bradley Simon. I'm here on behalf of Court Civic. Your Honor, it is our position that the lower court decision, the district court decision by Judge Kerr should be upheld by this court as New Jersey Statute AB-507 is in violation of the supremacy clause of the U.S. Constitution. I want to jump in on, I think, Judge Bevis's points about the actual havoc that will be created if AB-5207 is allowed to stand. Right now, the Elizabeth Detention Center is the only immigration facility in the state of New Jersey that houses federal detainees. As the affidavits submitted in conjunction with our brief from the various officials from the Department of Homeland Security said that New Jersey and EDC is mission critical to U.S. immigration enforcement in the state. Without EDC, as Judge Bevis mentioned, the ICE will be forced to bring detainees hundreds of miles away to smaller facilities, away from their homes, and wreak havoc on the administration of immigration detention. It will result in overcrowding. It will be, as the officials said in their affidavits, a complete mess. And what's worse, if AB-5207 is allowed to stand, other states could join in the fray, also pass similar statutes preventing private detention facilities. And then what happens? It's just an unspeakable havoc and a mess. So I'm focusing on some of the practical aspects, but from a legal perspective, it is a clear violation of the law. When you look at the statute, 1231 G-1 and G-2, 1231 G-1 says, Congress, the Secretary of the DHS, shall arrange for appropriate places of detention. And then G-2 says, before initiating any project for the construction of any new detention facility, DHS and ICE shall consider the availability for purchase or lease of any existing prisons, et cetera. Yes. So shall arrange, you can build, shall consider the availability before you build of anything else. That's not a very strong statute, is it? Well, as you pointed out when you read that, Judge Ambrose, it mentioned the option of leasing. And it gives the Department of Homeland Security the option of leasing facilities. When one thinks of leasing, we think of leasing with a private party, contracting with a private party. Well, there's four ways you can do it. They can have their own processing center, which they don't have. Right. They can lease from a private party. They can cut a deal with the instrumentalities of the state, like the counties, or they can cut some type of deal with the federal detention facilities that are already in that state. Or in this case, I guess it was the U.S. Marshal's leasing from Bergen County. Correct. But so there are options. There's at least four that we know of.  But one of those options includes, empowers the Secretary of the Department of Homeland Security to lease with a private party. And that's exactly what they've done in this case. So to say that the INA doesn't allow for private contracting, I think, is not true. There are provisions in there which do permit ICE and the Department of Homeland Security to so privately contract. But if G2 says that they shall consider the availability of the facility for purchase or lease of any other existing facility, and the answer is there ain't none.  Then they've considered it. And that means in the end, they've got to go build their own facility. Well, they've considered it, but among the options is to lease. Right now, the Department of Homeland Security does not own any facilities. And the notion that they would now, if this statute is allowed to go into effect, they would have to go out and construct new facilities from scratch, would be quite a burdensome and impractical. Is the facility, just a factual question, is the facility that's being the federal facility through the U.S. Marshals Service, is that no longer in play at all here? A federal facility? In other words, one of the things is that there were detentions for immigrants in Bergen County at a facility that the U.S. Marshals was leasing from Bergen County. My understanding, that's no longer operating.  How many facilities in the U.S. are there that are owned and operated by the government? Do you know? I do not know how many they own or operate, but I know that in the area of immigration enforcement, they have relied on private facilities, private companies like CoreCivic, like GEO, and they play a major part in immigration detention on the federal level. Isn't it, I mean, I guess maybe it's not today's issue, but isn't the easiest thing just to get Congress to draft something that supports Hoechlin and Sinker, your position? Well, I think there's enough in the statute already that authorizes the federal government to contract with private parties. In fact, the INA has a specific provision in there that says that the Secretary of Homeland Security, Shell, is permitted to enter into contracts. And then there have been the regulations, the CFRs that have been adopted, which expressly state that contracts can be entered into for a 15-year period. All right, so those authorize the leasing to you. These are regulations. Yes. And so you had contracts pursuant to those. I'm sorry? You had contracts pursuant to them, and you continue to have them but for this state law, correct? Yes. Of course, CIVIC has been operating the Elizabeth Detention Center, the EDC, since 1986 with successive contracts. So they've had a long – they've been in operation working with the Department of Homeland Security for decades now. All right. So your response, Mr. Feigenbaum was saying, well, Congress needs to go pass a law, but those regulations can also have preemptive effect. Yes, I think the regulations, and then there are different provisions within the immigration – the statute that allow for private contracting. But those are general contracting authorizations. Yes. Right? And you're not arguing that you have a right to a contract for private detention facilities, are you? A right to a private contract? Yes, they've had that for decades. They've had a contractual – they've had contracts. But I think her point is you don't have a right to sue Homeland Security if they don't award you a contract. No, no. The contracts are offered with competitive bids. You're going to have to refine. What's the right here? Well, the right is they won the contract. There were competitive bids that were issued by the Department of Homeland Security. They won the bid. They were awarded the contract, and they now have a contractual relationship with the Department of Homeland Security. They're not a decision to wanting to be in an adversarial relationship with them, but they have a contractual relationship. But there isn't already a contract. Or when a contract comes up for renewal, what is the nature of the right under the INA? The nature of the right? Well, they have the right to operate that facility. But let's say the contract is coming up for renewal, and New Jersey has passed AB 5207. Like, okay, we're not impairing the contract with the federal government now. We're just saying you can't do this again. Right. So then how would you define the nature of the right that you have at that point where they're not saying, okay, the contract runs through December 31st, 2024 or whatever, but you can't enter into a new one for 2025? Well, it's been CoreCivic's position that they have that right. And when this statute was passed, that was the reason why CoreCivic brought it. If we're looking to statutory language and you're resting on 1231G, we have the very next subsection of H that says that the statute does not create any substantive or procedural right of enforcement. So how can you argue that there is a private right? And without that, is there any argument for preemption? That they have a private right? I mean that they have the right to contract as the statute, the INA gives them that right to contract. But for preemption, don't you need to have the right? Yes. Doesn't it need to be the right? I see where you're going. I think you're arguing that it's not a – that for purposes of – they have to have a contract for purposes of preemption. I'm asking, not arguing. But we have the statutory language saying that there isn't a right on the part of any entity that would be otherwise the subject of an award, right? So – and if preemption, as we're told by the Supreme Court, requires that there be that right of a private party, then are we even in the realm of talking about obstacle preemption? Well, I think we are because it's interfering – the statute interferes with the government's discretion. Right. So it's not that you have a right against the federal government. It's that you have a right that if the federal government chooses to offer you this contract, you can accept it. Correct. Okay. I agree with that. So we have to read 1231H because 1231H is careful to say we're not opening ourselves up to suit the federal government by core civic. I agree with that. And that's obstacle preemption, but I don't even think you have to – if the court is troubled by the obstacle preemption analysis, the statute is clearly unconstitutional under intergovernmental immunity because it's directly interfering with the government's ability to conduct its business. And the law is clear. And I would point out that this statute is different from just about every other statute that's been analyzed in the Supreme Court, Third Circuit jurisprudence, Ninth Circuit jurisprudence, in that, well, it's similar to the law in the Geo case. But in every other case, including North Dakota and Leslie Miller, the states were trying to impose a regulation on a federal statute. Here it's an outright ban. It goes further than any other case. They want to prohibit completely private detention. It takes it to a whole other realm in the area of intergovernmental immunity. Well, your friend, Mr. Feigenbaum, characterized that we're not forbidding immigration detention. We're leaving open the possibility that the federal government can do it itself or can lease the facility. But the federal government has opted not to do that, and I think they have the right to pursue the options that they want to pursue, and I think the INA gives them that right. They have the right to consider leased facilities. They have the right to intern to contracts. So I think any way you slice it, this is an absolute obstruction or interference with the ability of the federal government to conduct their business, and the federal government has exclusive jurisdiction over immigration enforcement, and this is putting a major, major roadblock in their efforts to do their job in the state of New Jersey and will have an absolutely catastrophic effect on the whole area if they are forced to not use New Jersey as a place to detain detainees and have to rely on other states and send them hundreds of miles away. One of the prime benefits of New Jersey is that it's in close proximity to the two major airports, New York Airport and JFK, and having to send detainees into the hinterlands will make it – well, as the ICE officials said in their affidavits, it will just turn it into a nightmare and will make the whole realm of immigration detention enforcement unmanageable. One of the concerns that your colleague on the other side of the aisle has raised is how we go about evaluating when that substantial interference crosses the line, from permissible to impermissible, if we take that upon ourselves instead of leaving it to Congress. And we have many cases, New North Dakota, City of Detroit, Penn Dairies, that are saying this is a decision that Congress can make and there's this judgment call to be made about when that burden, that interference, crosses that threshold. Why isn't that right? Why shouldn't it be left to Congress? And what would be the test? How would you articulate when it does cross the line? Well, I think my colleague, Mr. Feigenbaum, on behalf of the state of New Jersey, is trying to argue that because the statute doesn't expressly mention the federal government that somehow there isn't direct regulation. But as Judge Kirsch said in his decision below, you've got to put aside labels for a minute. The fact that the government is not mentioned in the statute does not mean that it doesn't have a direct impact and doesn't directly regulate. Well, starting from the beginning, a private party, you're not. I come back to what right do you think you were given by this statute? By 32. What was it, the 1231, G1, G2. And then, of course, H kind of takes it off the field. But what right do you think that statute gave you? Well, that statute gives the federal government a right to consider leasing to private parties. Well, I mean, if you look at a case buoyed from the Supreme Court back in the 60s, you could have the Atomic Energy Commission building or operating a plant or leasing a plant, and one of those was taken away, and the court concluded that the contractors, both cost plus, contractors for profit, had not been incorporated into the government structure as to become instrumentalities. You're not saying that you're an instrumentality of the federal government, are you? No, no. But I think in that case there were considerations of cost. I mean, this is not one of those cases where the court has said, well, increased cost is not going to be a factor in whether we impose intergovernmental immunity. This goes far beyond that, cases like that, where it came down to the issue of cost. This is a case, a statute in New Jersey, which will have a drastic impact and basically shut down federal operations in a particular state. Doesn't it just make it cost a whole lot more in that particular state? I'm sorry? Doesn't it make it just cost a whole lot more if the federal government wants to have a detention facility in that particular state? No, it will cost a whole lot more, but it goes way beyond cost. It goes beyond absolutely putting roadblocks into the government's enforcement of the immigration laws, which they have exclusive jurisdiction. The state does not. It's strictly within the federal province. So, yes, you're right. If the New Jersey statute went into effect, it would have enormous cost, but it goes way beyond cost, the whole analysis, the impact that this will have. Thank you. If there are no more questions, half of my time will go to the Department of Justice. Thank you, Your Honor. Understood. Thank you. Thank you. Thank you. Good morning, Your Honor. May it please the Court. McKaney Weister on behalf of the United States. On a state's base, AB5207 outright prohibits contracts for private immigration detention facilities that the federal government not only would like to enter into, but already has entered into in the state of New Jersey. Under principles of intergovernmental immunity, however, states cannot regulate the relationship between the federal government and the personnel with whom the government contracts to operate federal programs. In addition, AB5207 does precisely that it violates the Supremacy Clause. Now, the Ombudsman circuit and geo group struck down a similar state law on the same ground, concluding that a ban on the use of private contractors for immigration detention impermissibly controls federal operations. Can I just ask you the same question? I started off with your co-counsel. If 1231 talks about. The government shall arrange for DHS, shall arrange for appropriate places. And 1231G2 says they shall consider what's available out there before they go build them. Doesn't the text have to be a lot more strong in your favor in order to say that your rights are being taken away? Because you can always, you can always, you could build. It's going to be cost more costly, obviously. But Congress hasn't really. Jumped into this fray as strongly as it could. Yeah, sure. We disagree that the statute's not sufficient and I just want to bracket Congress doesn't have to speak any more clearly and the court doesn't need to reach preemption because the state is not allowed to control federal operations by telling the federal government that it can't work with states under intergovernmental meaning. So whatever the statute says and whether it's sufficient for preemption, it doesn't matter under the other doctrines. But I'm happy to answer your question. And I guess as we come back to the argument from North Dakota, which appears to have been resolved by the Supreme Court, do you look at direct effect on the federal government, forgetting discrimination for the moment, versus indirect effect, which is what I perceive Justice Brennan was arguing, that there can be interference that causes burdens on the government that indirectly affect it. That seems to have been read out of the analysis of intergovernmental immunity. And so what is the direct effect in terms of SB 5207? Yes, Your Honor. So we think that the state is misreading the Supreme Court's precedence in this space, and that the cases before North Dakota, and what the Supreme Court did in Washington, don't have the effect of prohibiting any laws that obstruct federal programs from falling within. What language in Washington supports you? Yes, Your Honor. And to be clear, I do want to answer Your Honor's questions about preemption as well, but we'll start with this. Yeah, we'll get to that. I promise. So looking at the cases that preceded North Dakota, I think it's helpful to start there to sort of set up the framework of how this doctrine has developed. Before North Dakota, there were a number of cases explaining that intergovernmental immunity used to be satisfied by a law imposed on federal contractors that nearly increased costs to the federal government by passing through the cost of nondiscriminatory taxes or price controls. And the cases before North Dakota said, that's actually not right. It's actually a law that is falling on federal contractors, and it only has the effect of incidentally possibly increasing the government's costs by some pass-through costs. That's actually not a problem under intergovernmental immunity principles. And that's clear from the court decisions in the New Mexico case, Fresno County, as Judge Bevis flagged, as well as the Penderes case itself, Public Utilities Commission, City of Detroit v. Murray Corporation, all of those cases recognized that just because there's an incidental increase in cost, it doesn't violate intergovernmental immunity. But those cases specifically noted that where those taxes were permissible, they did not obstruct or control federal operations. So the court specifically reserved the possibility that things that fell into that other category that actually control or obstruct or interfere with federal operations would not be valid exercises of state law. What case says that states can never regulate contractors who work with the federal government? I don't have a case that stands for that proposition, Your Honor, but I don't think it's disputed that intergovernmental immunity was a very broad doctrine and even taxes on contractors. But it's been cut back. It has, Your Honor, but it's only been cut back with respect to laws that incidentally could pass on costs to the federal government, like taxes or price controls, that are really things that apply to a contractor as a private business and ultimately won't have any effect on how the federal program is run. It just might pass through some costs. So there are two ways you could be understanding this. One could be, yes, there's really just two prongs here for intergovernmental immunity, but we mustn't exalt form over function. And functionally, this is on the federal government, even though nominally it's applying to contractors. The other could be, okay, we'll take the name, but we'll understand substantial interference to be a background principle that most of the time will show up in those two prongs, but they're not exclusive and McCulloch still has some independent vitality and you can't evade the two prongs by writing a law that's just shy of that. So which way does the government ask us to understand intergovernmental immunity? Is it really just those two prongs or are those two prongs kind of the situations have come up before and no state has ever tried to do something like this before and we shouldn't feel bound to have to shoehorn it in to one of those two categories? So we think it is best understood as two prongs to this doctrine, Your Honor. First, whether a state law is infamously regulating federal operations. And second, whether it's not a neutral, generally applicable law, but it actually is discriminating. And under the first prong, the plurality in North Dakota did try to cut that back and say regulation doesn't occur when a law is actually acting against a supplier and not the federal government itself. But the cases preceding that didn't draw that line and the Supreme Court in Washington also didn't draw that line. Washington is a discrimination case. It's not a direct regulation case. I agree, Your Honor. And so we don't think that the Supreme Court in Washington meant to adopt a position on this contested principle from North Dakota and enact a sea change in the cases in this area. And if you look at what the court actually said in Washington, it's consistent that it wasn't actually trying to do that. It specifically recognized that the Constitution prohibits states from regulating federal operations. And so it's reflecting the trend in earlier case law, that increased costs alone are not a problem under the doctrine. But beyond that, when you have circumstances where federal operations are being regulated, the statute itself might not say the United States, but the effect of that could be that a state law is no longer unconstitutional   and that statute is exactly the same. It's regulating federal operations by controlling the relationship between the federal government and its contractor, regulating that contractual relationship itself with ABC. Isn't the test, you keep saying impermissible regulation, but isn't the test direct regulation? So that's the shorthand that the plurality used in North Dakota. And other cases have sort of said that as the same shorthand, but they're not taking a position on whether direct regulation can never involve a regulation that acts upon a contractor. I think a better way to understand this is the framing that this court used in the treasurer of New Jersey versus U.S. Department of Treasury case. And there the court did tear it, that language from North Dakota, but then it went on to explain that it's looking for direct regulation of federal operations. The federal operations are ultimately the question that you look at here, not just whether the U.S. is named in the statute, but whether the effect of this law is to regulate federal operations themselves. And that's clear from the face of AB 5207. But even when you were saying you get more support pre-North Dakota with respect to the type of test that you want, but when you even go back to 1943 to Penn Dairy's, the Supreme Court says, we see no basis for implying from the constitution alone, a restriction upon such regulation, which Congress has not seen fit to impose unless the regulations are shown to be inconsistent with congressional policy. And I think that's, your solace here has to be somehow this is so inconsistent with federal policy that it must be direct. But when do you cross the line from permissible to impermissible? I definitely want to get to the question of laundering, Your Honor. I think it's important, but I just also want to start with the text of Penn Dairy's because we don't think that it supports the state and the way the state claims. If you look at the discussion in this case, the court explains that intergovernmental immunity applies when there's a regulation of the performance by federal officers and agencies of governmental functions. And then it explains that those who contract to furnish supplies or render services to the government are not such agencies. And this is important. Do not perform governmental functions. So Penn Dairy's was looking at milk suppliers and milk suppliers clearly are providing a good to the federal government. They're not providing governmental functions themselves. And so the court said, if you can have price controls on those kinds of supplies, because those suppliers aren't performing governmental functions and the only effect might be to increase the prices to the federal government, but that's not a problem. What we have here are governmental functions, federal operations that are being performed by a federal contractor at the direction of immigration and customs enforcement. So Penn Dairy's is talking about suppliers that don't do governmental operations, very different than federal contractors who operate immigration detention facilities. And so in terms of what the effect is, how would you distinguish footnote eight that your opposing council refers to in North Dakota? Yes, your Honor. So I do want to get to the line drawing question as well, but I'll come back to that. I'm sorry. If you want to do the line drawing first, then we'll come back to it. Great. So we agree that there are circumstances where there will be hard questions and difficult line drawing considerations in this space, but the court simply doesn't have to get into any of that right now because the case that we have before the court falls into a very specific category where what the law is doing is regulating that relationship between the federal government and its contractor is prohibiting that contractual relationship. And so on its face, it's the federal operations and that federal relationship that is being prohibited. And so the court can say that categorically when we're talking about this kind of case, where the regulation is on that relationship between the federal government and its contractor has the effect of regulating that relationship, imposing additional requirements, or here prohibiting it at all that is categorically not permitted under intergovernmental immunity. But you're saying categorically only where that contractor is performing a federal function. We think that the court can say that for purposes of this case. And that resolves the question here. Now we do think that there are other cases that will be a more difficult line drawing consideration. And those sort of fall in the middle. And first I'd like to just sort of delineate what we think are the easy cases on the other side of the spectrum. And those are the incidental property or income taxes that apply to federal contractors and their employees, or wage and hour laws, for instance, that are regulating a federal contractor in its capacity as a private employer. Those are the kinds of things that incidentally might raise some costs for the federal government, but really themselves shouldn't be considered a regulation of federal operations. So we think the court can also sort of recognize consistent with the tax cases that are being cited throughout these cases, that that is still perfectly permissible with respect to like normal taxes on federal contractors. In the middle, there's a category of other kinds of questions where it's not necessarily directly calling out that federal contractual relationship, but it's also regulating in a way that is relevant to federal operations. And so the question there will be much more difficult in terms of, is this actually a regulation of federal operations? And is this the kind of obstruction of federal operations that is impermissible? But the court has that to the line drawing. So yes, those are the kind of facts specific questions that we really can't answer in the abstract here. So the purposes of this case, it is very clear that this kind of regulation is not permitted. Whatever other kinds of cases might arise in this space, the court should reserve its opinion for those cases when the facts are actually presented and the questions can be grappled with in that concrete factual context. Didn't New Mexico. I'll come back to put that later. Didn't New Mexico say the contractors and even agents only count as the government itself. If they stand literally in the government shoes. In other words, it's not an agency concept. So there's a difference your honor. I think when you're talking about federal employees or federal instrumentalities or federal property, those are the kinds of cases that are very, very easy because that's clearly a regulation that falls in the federal government itself. When you're dealing with contractors, we don't dispute that those are not, they're not federal employees. You're not necessarily a federal instrumentality, which is why there are these more difficult questions. It's why taxes are permitted for instance, but those are still entities that are carrying out federal operations for the federal government. And so when it is those regulations themselves that are being sorry, those operations themselves that are being regulated, it's exactly the same as the United States was called out expressly in statute. And as a Supreme court recognized in the city of Detroit, the Murray corporation, you don't look at the words of the statute. You look through the form to the substance, to determine what the actual practical effect is of a state regulation. Here. It's clear. The effect is to prohibit the United States from working with its chosen contractor to operate these facilities. Now with respect to footnote eight, judge Ambrose, I believe, and you can correct me if I'm wrong. That's the footnote that explains the difference between justice Brennan, the justice Stevens. Sure. And with respect to says that Congress should be the one that is sort of pleasing these lines. So the problem. If it basically was saying to justice Brennan's approach of what burden being a burden on government, the federal government, how do you measure that? And it gave some examples of just was too amorphous according to justice Stevens. Yes. And we agree. There will be a difficult line drawing problems, but courts are used to doing those, those difficult analyses of fact-based questions and trying to police those lines in the circumstances where they arrive. But it's really difficult for the court to sort of predetermine all of those answers in advance here, when those are factual questions that are only presented in the abstract and we don't need to reach them because these circumstances present a very clear categorical circumstance on the other side of the spectrum. Now with respect to, I believe judge Krauss asked this question. I think it's related about why not leaving these determinations to Congress and the problem with thinking about the doctor in that way is that it permits states to do precisely the same thing in effect that they are not allowed to do directly just by creatively drafting a statute as the plurality in North Dakota, the discrimination problem exists because even if it's not directly targeting federal employees themselves, federal officials, it can be just as obstructive to federal operations as it would be if it was a direct regulation. But isn't it the risk that the federal government takes on when it decides to privatize a federal function? And I mean, that's what we were dealing with in the Pennsylvania hearing board case, right? And if the government is choosing to take on the genius of a private contractor, then it's got to take on the price that goes with that. I mean, here in that, that would translate into the federal government either not having that sort of immunity on the restraint on private contractors or doing it itself, right? Owning, owning it and, and running immigration detention as a federal function that the government is not privatizing. The problem with that is the government uses federal contractors all the time for all sorts of things, munitions, war planes, trips to the international space station. There are all sorts of functions that the government relies on contractors for various reasons. The reasons here are in order to ensure flexibility and for cost savings. And when the government chooses to work with its desired personnel for carrying out federal operations, it's not consenting to state regulation in doing that. It recognizes that private contractors are subject to some different rules. They can be taxed. They generally will follow state wage and hour laws, things like that. There are some things that might be applied to them that wouldn't apply to the federal government. But as the case is recognized, those are all incidental things. Those are things that might affect the cost of a contract on the margin, but aren't actually regulating the federal operations themselves. States don't have the authority to do that. How important is it that we define the market? Mr. Feigenbaum, your friend wants to define the relevant market as detention. Okay. But you want us to understand this in terms of immigration detention. And the case for this being a regulation of the federal government is a lot stronger if we understand it as immigration detention than if we understand it just as detention. But is there a neutral way to pick between those two framings? Your Honor, I don't understand that framing to be very important when we're talking about the regulation problem. Because at the end of the day, the question is, is the state actually regulating federal operations, this federal relationship or not? And it doesn't really matter how you define the market. The state can pass a general law banning immigration detention, banning all detention, banning private detention. It can pass any of those laws, but that doesn't matter for purposes of regulation. How much we look through form to substance, right? Because if they impose a 50% tax on milk transactions, right? Well, lots of private people buy milk. If they impose a 50% tax on detention, well, that might be different. If they don't impose a substantial tax on immigration detention, we can see through that, that they really are trying to get at a federal behavior. Yes, Your Honor. And I think when you're asking the question, what are they really trying to get at? It's definitely relevant, I think, for the discrimination prong. But when you're talking about the regulation prong, you are considering the practical effect. And I'm not sure that I would agree that those are definitely different. But you do think that we should take a functional analysis of what is direct regulation and not be bound by the label that the incidence falls on poor civic. I think that's correct, Your Honor. I think that's consistent with how the Supreme Court has looked at these cases. Again, it's the city of Detroit case. Asking about what the practical effect is and not just the definition or the words being used. And there's no reason to import a magic words test into the intergovernmental immunity. Another related point I'd just like to add, Your Honor. Can we come back full circle? How do I know when something goes from incidental to impermissible? Functionally or otherwise? I think that that will be a difficult question in some circumstances for the courts to consider. We know that courts think that normal taxes are incidental, that price regulations that will maybe have the effect of maybe passing along some tax or costs are incidental. But all those cases sort of in between are going to be very fact-specific inquiries that it's impossible to predetermine in advance. But don't you need to give us some standard, some definition of that line? Because if you can't, then no data is right, right? If you can't, then this is just not administrable. And perhaps it should be left to Congress. Well, Your Honor, there are plenty of inquiries that courts undertake that are fact-specific and really do proceed on a case-by-case basis. And I think that particularly makes sense in this space when we're talking about federalism concerns and the relationship between the states and federal government that we wait for circumstances to arise in which there actually is a conflict and then adjudicate that conflict based on the facts presented. And I'll just note that as a practical matter here, those questions don't really arise with respect to immigration detention because ICE generally includes in its contracts with contractors clauses that tell them that they should be following generally applicable state and local laws. ICE is cooperating with state governments when it's having its contractor facilities operate within their jurisdictions. And so as a practical matter, a lot of those difficult questions might not arise at all. And so for the court to sort of try to reach out and decide them in advance, it's presupposing conflicts that the sovereigns might work together and might never actually arise. I'd just also like to note that my friend on the other side is saying that if it were a direct regulation, that would mean New Jersey is directly prohibiting ICE from doing any immigration detention in the state. And so the implication is he thinks this is not direct regulation because it's a more modest regulation and only prohibiting one form of immigration detention. But the fact that it's not a more extreme and obvious violation of intergovernmental immunity doesn't make it any less impermissible under the Supremacy Clause. The precedents are being cited. Is this the first case involving a ban? I mean, set aside GEO Group and the Ninth Circuit, et cetera, but we have a ban. And so as you say, there are going to be some hard cases, but what we have to decide today is, can they ban someone entirely from providing something? Yes, sir, and I think that makes it a very easy case. I'm not aware of any other cases that involve this kind of ban, but you can still think about the case through the lens of Leslie Miller and the licensing cases and cases like Public Utilities Commission, Ferry v. Florida, which is cited in the GEO Group decision. And in those cases, there was a licensing scheme in the state that had requirements on entities before they could engage in certain conduct. And there was also a federal determination that the federal government, specifically with respect to Leslie Miller, wanted to work with these contractors to carry out federal programs. And the Supreme Court said that, of course, a state cannot impose additional requirements on top of the requirements that the federal government has deemed sufficient. And in doing that, it cited and relied on Johnson v. Maryland, which is a case in which the Supreme Court said states can't make postal workers get a driver's license because the federal government has determined that this is the person who will be carrying out federal functions, has determined this person is eligible to do that work, and a state can't come in imposing a new requirement, a new hoop to jump through that is in addition to what the federal government has already determined to be sufficient. Is that intergovernmental unity where we're looking at a curtailing of discretion of the government, or is that preemption where there are specific licensing requirements that have been laid out by the government that conflict with the state law? So Leslie Miller and Public Utilities Commission definitely demonstrate that those doctrines are sort of overlapping and mutually reinforcing in this space. I'll note that this court in the city of Philadelphia decision already construed those cases as intergovernmental immunity cases, and we think that that's the right analysis because they're relying on Johnson v. Maryland, which is clearly an intergovernmental immunity case. And if imposing those kind of licensing requirements is impermissible in Leslie Miller, then it is certainly impermissible for the state to say that categorically no private facility is eligible to operate any of these federal programs. That goes way beyond just imposing new requirements and imposes an outright prohibition that the government cannot work with its chosen personnel to carry out these programs, and that's not something the Supremacy Clause has ever permitted a state to do. The city of Philadelphia was what, 1986? Yes, I believe that's correct. Dakota was 1990. Sorry, Your Honor? North Dakota was 1990. Yes, Your Honor, and there wasn't a definitive determination in that case of how to construe those cases for justices disagreed on either side. I think the proper reading of them, though, is that they are drawing on principles from both doctrines. The citation to Johnson clearly invokes intergovernmental immunity. The discussion of licensing schemes falls more within what you would consider from a preemption analysis, and if you look at the beginning of the discussion in Leslie Miller, the court specifically says that the question is whether applying the statute to this contractor, quote, interferes with the federal government's power to select contractors and schedule construction and is in conflict with the federal law regulating procurement. Those two things are, the first clause, intergovernmental immunity, and the second, preemption. I often think, and maybe incorrectly, I often think Leslie Miller is primarily a preemption case. And that's what some courts have read it to be, Your Honor. This court in the city of Philadelphia disagreed with that, but even if it is, it doesn't help the state here because under preemption principles, the same thing is happening. The federal government has determined that it can contract with these individuals that they're eligible to contract. There's various eligibility requirements that you can find, for instance, in the Appropriations Act and in the various regulations at issue that determine whether a facility can operate in this space. The government said not only can they operate, but that this specific facility meets those requirements and is an appropriate place to house detainees under the statute. That determination has already been made. Now, the state seeks to come in and say, actually, no, the federal government thinks that these entities are eligible to do this work, but we're going to say that no private entity at all is possibly eligible to carry out these programs. That's exactly what happened, but that's not just what happened in Leslie Miller. It goes beyond Leslie Miller and is even more obviously a violation of the Supremacy Clause. Now, I'm happy to talk more in depth about the preemption issue. We sort of skipped that at the beginning, Your Honor. I guess maybe what right does this statute confer on a private actor or civic? Yes, Your Honor. So in reading the statute, and we sort of talked about this in the call, please, earlier, that the statute isn't conferring a right on contractors against the federal government, but it is recognizing that they have a right to compete for these contracts, to enter into these contracts if selected, and that when the government puts out a call for potential facilities, a request for proposals, for instance, a facility has the right to choose to offer itself up and to be voluntarily offering to engage in this process of providing these services. And if you look at the text of 1231, that's clearly what Congress intended in this space. So starting with the beginning of that section, 1231-G-1, if I can find the statute. 1231-G-1 says that the Attorney General, really the Secretary of DHS, shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. Appropriate places of detention. It's conferring discretion and authority on the agency to determine what places are appropriate and to use those places to house these individuals. The statute then goes on to create an order of operations where Congress expects that the agency is going to do certain things in order to conserve resources and ensure flexibility, and that is to look for certain options first. If the United States government facilities are available or if, quote, facilities adapted or suitably located for detention are available, then the agency is required to use those facilities for housing provided those facilities are appropriate in the agency's determination. Well, under G-2 provided that they're available. Yes, Your Honor, but there's no reason to read availability in the statute in an unnatural way to sort of import the ability of states to regulate. Available in this context means Congress fully intended that these options are part of the scheme, are available. The design is that these options are preferred, and for them to be available means that as a practical matter, there physically is a facility. It's suitably adapted to do this work, and the owner or entity that is going to contract for a lease for the facility, that they are going to voluntarily enter into this contract with the United States. It's a practical, physical sense of what it means to be available because that's what Congress intended when it was setting up this design, that if these facilities are there, then ICE is supposed to try to use them before it then expends funds to purchase or construct its own facilities in the state. If DHS or ICE decided as a matter of policy that we're just going to construct our own facilities, despite the fact they have every option for getting this particular case, there's nothing wrong with that, is there? G2 seems to say they can't do that until they go through the considering the availability for purchase or lease. Yes, Your Honor. It sets up an order of operations that in order to then expend that money and operate a much more expensive inflexible program, they have to first determine whether the preferred facility... It does say before getting a project for the construction. Yes, Your Honor. And so that's consistent then with the appropriations provisions that appropriate funds for this and say that it can be expended for these contracts provided that the facilities get adequate ratings and then all of the regulations that talk about these private facilities and what requirements they have to meet in order to satisfy the statute and the fact that they are determined to be eligible by the relevant offices. This space is designed essentially by Congress with some delegated discretion to the agency that has promulgated these regulations that contemplates that these facilities are available and preferred. So my question is, it does say before initiating, that shall consider, but what happens if they say, okay, I have considered, so what? I'm going to build my own facility because I think long-term that's the best option. I think that would be a difficult question, Your Honor, with respect to the statute. There is discretion in the statute, so the Secretary has to determine that these places are appropriate. But here, that's not what happens. We know that ICE thinks this is an appropriate facility, wants to continue to work with this facility, and it's only the state law that's interfering and preventing ICE from doing that, potentially going forward if the law is upheld and the contract needs to be renewed. States simply have no authority to disrupt the congressional design and impede the fulfillment of Congress's objectives and intent in this space. Congress wanted a flexible, cost-effective program, and so gave ICE a lot of discretion but required it to consider certain options that are preferred in this space. The agency has been doing that by using these private contractor facilities. The state can't come in and say, actually, we know better. We're going to take the preferred option off the table and require the agency to abide by a scheme that is completely different than the one that Congress intended. That is a classic case of obstacle preemption. I guess what I'm saying is, G2, if it had a tail on it, that before initiating, you shall consider the availability of other options, and the tail would be, you can't build your own facility until you have not just considered them, but for whatever reason, decided that you had to opt out of those other considerations. It obviously would have to be put into more clean language, but the point is, it seems like there's total discretion at the DHS-ICE level, and the statute doesn't really fully answer what you must do other than consider the options. I think I read the statute slightly different, Your Honor. I think it is Congress sort of setting up this order of preferred options and giving us discretion to use the options it determines to be appropriate, but to consider the options in a particular order that best serves Congress's objectives of cost savings and flexibility. I don't think Congress had to spell that out any more clearly in the statute for those to be the statutory goals that Congress meant to accomplish by this. By removing private facilities from the list of possible facilities to use, it contemplates a completely different scheme of detention than the one that Congress set up and expected that the agency would be able to use. We know that Congress understands that the agency uses these private contract facilities. It's been happening for decades. Congress has these appropriations where it talks about paying for facilities under the contract. There is a statutory provision that specifically recognizes that there are privately owned and operated facilities. That's not cited in the brief, but it's 6 U.S.C. Section 205b3. Congress specifically recognizes these facilities exist, that ICE uses them, and that they are a preferred option because they would prevent ICE from needing to purchase and construct and operate its own facilities. The state can't take away Congress's preferred option in its overall statutory design without impeding the objectives of the statute. So is this coming back? Is your theme that prohibiting private contracting, as was done here, regulates the federal government when that contractor is performing a federal government function? Yes, Your Honor. I think that that is the easy case that we have before us, that the statute is trying to prohibit ICE from working with a contractor to carry out federal operations. And so whatever difficult line drawing there might be in other cases, this is a clear case where the Supremacy Clause does not permit that kind of construction. Is that a direct regulation? Yes, Your Honor. We think that that is a, if Your Honor wants to call it, a direct regulation of federal operations. That's essentially what's happening. It is a direct regulation on the contract between the federal government and this party and on detention operations themselves. We think the word direct is a bit of a red herring in this case. We think the real question is sort of about the effect of the statute and the effect of the regulation. If it has the effect of regulating federal operations and here placing a prohibition on the federal government, then it clearly can't survive. Usually when we read statutes, at least in the last 50 years, we look at the text first, and if it's ambiguous, the effect later. Well, Your Honor, in this space, intergovernmental immunity and preemption are overlapping and mutually reinforcing, and so the court really can sort of consider them together or rule on either of those doctrines. Obviously the statute, the statutory text with respect to federal statute, is very relevant to the preemption inquiry, but the court doesn't even really need to go there because under intergovernmental immunity principles, this is clearly prohibited. My friend on the other side is essentially trying to collapse the regulation prong with obstacle preemption in this space. There's simply no reason to do that. Those are different doctrines. Intergovernmental immunity has been established since McCulloch v. Maryland, and that's what the Supreme Court recently reaffirmed in the Washington case. There's simply no reason to now try to limit that doctrine in a way that other courts haven't been fit to do, and the Ninth Circuit, specifically in the Geo Group case, addressed all of these issues and concluded that this is an impermissible regulation of federal government under intergovernmental immunity, and it is preempted by federal laws in this space. There's no reason to create a circuit split with that case or to disregard the numerous Supreme Court precedents in this space. The effects on the federal government and the prohibition to which you keep referring, it's really just a curtailing of discretion, right? It can be framed that way, Your Honor, but it is a direct prohibition on a contract that we know the federal government has already entered into and wants to continue to enter into within the state. But that contract is just one way that the federal government can have an immigration detention facility in the state, right? It is, Your Honor, but that's essentially... To say that that's fine would be to permit the state to control how the federal government carries out their operations.  That seems to be a limitation on what would otherwise be less fettered discretion, right? I think it's possible to frame it that way, Your Honor. With respect to our preemption argument, we do rely on the discretion in the statute and a number of cases where courts explain that states can't impose additional conditions on top of a congressional directive that does grant discretion. In those cases, like Crosby, like Arizona, there's a far more detailed scheme, right, that's in place that creates a conflict. Here, you're asking us to read a whole lot into 1231G, and to the extent you're analogizing to the licensing cases, what we have in Section 235.3 in CFR, the requirements for a private contractor are just very few and very basic. Is there enough here in terms of the level of detail in the regulatory scheme to say that this equates to those cases where sufficient interference was found or where there was a sufficient conflict for preemption purposes? We think that there definitely is, Your Honor. Now, we're talking about preemption, so I'm going to focus on that, but also if you look at Leslie Miller Public Utilities Commission, those also were framed as intergovernmental immunity decisions, and that focus at a high level on there is a federal contractor, the federal government has determined that they want to work with this contractor, that the contractor is eligible, and the state tries to impose requirements on that, and under Johnson v. Maryland, that's not permissible under intergovernmental immunity, so we think that's certainly enough. With respect to preemption, we think that the statute does enough here for the court to be able to discern what were Congress's objectives in this space, what did Congress intend with respect to how this would work. Congress intended that the agency would be able to look to suitably adapted or located facilities, those are contract facilities, and be able to use those when the agency determined that those were appropriate places of detention. So framed in terms of the actual specific question that we're focused on, we know Congress thought that these facilities should be used for this purpose if ICE determined they're appropriate to be used, and ICE has made that determination here. The state is trying to come in and say, even though ICE thinks this is an appropriate facility or that sometimes these are appropriate facilities, New Jersey is going to say that they are never appropriate under any circumstance within their state. That is a clear conflict with what Congress intended in setting up this scheme for the agency, so we think it's clearly sufficient under those cases. The contractor requirements in Leslie Miller, for instance, maybe were framed slightly differently. They talked about, you know, you could say that there was sort of like a direct right at issue, but there are rights at issue in this statutory scheme. The right to contract, the right to make a facility, to volunteer a facility for use for this purpose, the right to enter that contract when it's been mutually agreed upon by the parties. New Jersey is coming in and taking away all those rights from the contractor in this case, notwithstanding the fact that the federal government has determined that they're eligible to operate these federal operations. Fundamentally, New Jersey agrees that if ICE were operating this facility itself, that the state couldn't regulate the facility. If ICE owned it and operates it, the state has nothing to say. Just because ICE chooses to work with a federal contractor to carry out this federal operation, that shouldn't change anything about this inquiry. It's the operations themselves and that federal relationship between the parties that's being targeted and regulated by the state statute in this case, and that's not permissible under the Supreme Court's intergovernmental immunity cases and also the preemption cases, for instance, Leslie Miller Public Utilities Commission and any number of others. I think we've finished any argument, unless my colleagues have further questions. Thank you. Thank you. Mr. Feigenbaum, can you begin with the sort of oddity that the federal government couldn't impose an additional requirement on a contractor in terms of like a licensing scheme, but as you would have it, could entirely prohibit that contractor that otherwise would be qualified in the view of the federal government? You mean the state government couldn't do that? I understood the question that way. Yeah, yeah, yeah. Sorry. This is a Leslie Miller PUC kind of question. So that's actually not the line we've ever drawn in this case. I just think they're not reading Leslie Miller and PUC correctly. I think the problem in those cases was, as you put it, Your Honor, there's a reticulated or detailed or whatever you want to call it, comprehensive scheme in Leslie Miller and PUC that implied a right to provide that service irrespective of any other state law restrictions or, you know, disabilities. And I'm sorry, Judge Ambrose. No, why don't you finish that? And I accept that that kind of preemption could exist. I think it's a high bar, especially after the last few years of Supreme Court precedent to find that kind of implication from a statute. But I think 1231G is a really hard place to find it. And this goes to a colloquy with Judge Ambrose earlier and maybe back and forth between Judges Vivas and Ambrose. The law said, consider what's available and including to buy or lease private facilities. That's the preference. They can buy or lease facilities today and operate it themselves. They could buy or lease the Elizabeth Detention Center itself. And then if it's not there, go build your own. So I think you could have a world in which you have such reticulated requirements on federal licensing set by statute or regulation that it implicitly preempts the ability to have any additional state ones. Why is this sufficient? We've got a regulation, albeit very basic. But isn't that to say that the federal government's decided it's pretty minimal requirements for at least the baseline of what is permissible in terms of the private contractor that would be hired? So I think regulations can have preemptive effect. I would just notice a threshold point. I think it's a kind of higher bar because of all of the Supreme Court precedents making clear it's federal law that's supreme. So it has to be the regulation implementing the law. And I think it's tough when you pair the regulations with 1231G. What I understand the pair to be is to say, you, federal officials, go out to the marketplace, see what's available. Regulation comes in and says, from what's available, here's what we'll work with. And if nothing is available, go construct your own. So it fits together. Whereas saying the regulations gave you a right not just to see what's available, but to force things to be available that state law doesn't make available would make the regs have preemptive force that just doesn't work with the statute. Mr. Feigenbaum, when asking about intergovernmental immunity, you kept deflecting things over to preemption, and then you stressed that there's a high standard for preemption. I don't see what's left of the first direct regulation problem. You can see this there in theory. And yet when I give you hypos in practice, I gave you one about a private contractor for the mints, I gave you one about munitions, you wouldn't give me a straight answer. Is there any reg that doesn't name the federal government that will flunk the direct regulation problem? Or is that a dead letter under your reading? I'm so sorry. I just want to separate things. You don't need regs for intergovernmental preemption. Not a regulation. A statute. A state statute. Is there any state statute that does not name the United States federal government, governmental entity, et cetera, that would nevertheless flunk the first one? Or is yours a formalistic, if the government isn't named, then we are in nondiscrimination land or else preemption land? So I want to answer this correctly in a way that doesn't at all sound misleading. It doesn't have to name the United States. It has to apply directly to the United States. And I think this new mice here agrees, which is why there was some difficulty in some of the calls. Well, then answer my mint and munitions hypos. Give me a yes or no. Would a contract – I thought I said no. I'm sorry. I don't think those are direct regulation. I was saying I'm struggling because preemption might kick in in a lot of those cases. Preemption might kick in in those too. But you could ban all federal military contractors, defense contractors from making missiles, et cetera, and say you are not allowed to make missiles anywhere within – the U.S. has to build its own munitions sector if it wants to do it within the boundaries of New Jersey. So two things. One, it would have to be a ban on making that product in the borders. It can't be a ban on making it only for the federal government.  That would be a discrimination. Okay. So sidewinder missiles. Nominally, we're not mentioning the federal government, but it's illegal for anyone other than the federal government to buy a sidewinder missile. Okay? But because it's a market of one, you say that's okay. And then you came back to that, well, in theory, there's the equal protection class of one. We could be in discrimination territory there. But it wouldn't flunk direct regulation. So I know you're going to feel this is formal, but I do think it's important to just explain something. You're asking about buying, and what Ms. Neumeister and I would be in vigorous agreement about is that even a neutral law about buying couldn't be applied to the federal government. Okay. Because the federal government is the buyer. The federal government contracts for somebody else to make sidewinder missiles. Yes. That's what we're – I'm not trying to hide here. I think if we are regulating the seller of the product neutrally, intergovernmental immunity does not step in the way. I'm not trying to run away from that, but let me just read from Pandaria's, which I think says the same thing and does some quick work of some of the points the United States was making. The trend in our decisions is not to extend governmental immunity from state taxation and regulation beyond the national government itself, and this is important, and governmental functions performed by its officers and agents. This is so important, and I think that's really what's missing in the colloquies. It's not about what the function is. Agents perform it.  You don't think that these count as agents within that? No, the United States has never made that argument, and I don't think it would hold here. I don't know any case that does sort of common law and agency that gets you there. They haven't presented it here. I think it would be a kind of weird and separate question, but no case goes that way. And I'll just note a couple examples that I think do some quick work here. In Pandaria's itself, and this is a majority opinion, not the North Dakota split, in this burden, if Congress has not acted to forbid it, we can find no different or greater impairment of federal authority than in, and then it gives examples, a regulation on transporting workers, which is obviously a government function, transporting your own employees, or in building regulations implied to a contractor engaged in constructing a post office building. That is an obvious government function. That is a service you are providing. State law can still apply to that entity. So let me maybe go to the 30,000 foot level and talk about this, because I think this gets to one of the biggest problems I'm having today, which is I just don't understand what the lines being proposed are, or how they would work in future cases. So there have been four lines, as I see it, that have been offered. Before you go there, I'm not sure. I clearly understand your answer to Judge Bevis' question, or the similar question I had asked earlier. What is the difference between applying to the federal government and naming the federal government, given that you don't acknowledge indirect prohibitions on the federal government's conduct as applying to the federal government? Let me just use a hypothetical that will show the different parts here. No one may make missiles. We don't name the United States or anything like that. It doesn't name the U.S. But Ms. Neumeister and I fully agree, and this was I think some of the confusion in some of the earlier colloquies, we can't apply that to the United States because intergovernmental immunity blocks applications of neutral laws to the United States, regardless of whether it's named in them. So we certainly couldn't say the U.S. may not make missiles, but we also just couldn't say no one may make missiles. The question becomes, can we apply that law to a private party? And there I see the answer is yes, and that's Pennsylvania Hearing Board. If the federal government wants to privatize and work with a private party, Congress can free them of any state law disabilities to that work, or they take the good with the bad as long as it's a neutral law. And so that's where I think it's really helpful to just think of a neutral law because direct assumes nondiscriminatory for all of these cases. So that's why I wanted to be really clear. You don't have to name the federal government, but you have to have the federal government not as an affected party, but as the subject of the law. Maybe that's the easiest way to think about it. Directly apply the subject of the law, named or not named. And I think that's what North Dakota is getting at in that case. And that gets, I think, to the broader point I want to make about how the administrability challenges that we're facing today. I realize there aren't a lot of intergovernmental immunity cases. It's kind of an odd area, but there's been four tests that I've heard from the podium or the bench today that I want to talk about. One is, I'll note when I see it or I don't decide it here, two is government's functions, three is U.S. as the only counterparty to this law, and four is it's a ban. And I think if I've left any out, please let me know if there are other ones I should talk about at the end. But those are the four I see. So I want to talk about first, don't decide I know it when I see it. I don't think don't decide I know it when I see it works for the reasons North Dakota gave in footnote eight. And more generally, I think it is unsatisfying. I think it is a fraught enterprise. And I don't know what the baseline standard would be to figure out that administrability question. Again, it's not just that there will be edge cases. It's that I don't know what the test would be for figuring out where the edge is, if it's just about a level of burden that's intolerable. So I don't think I don't decide I know it when I see it's going to work. Second, on government functions, I just read from Penn Dairy, it's talking about transporting workers, post offices, and about government functions performed by agents and officers. So I don't think it's consistent with majority decisions from the United States Supreme Court. I also don't really think it's workable, because I don't know why constructing a post office and having regulations applied to them or not would or would not make a difference. And again, if you're doing government functions as a test, that's not the same thing as bans. So that would need to involve regulations. That would need to involve taxation. That's just a different line that you're drawing along the way. So I don't think government functions works with the precedent or with workability. Then you get to what I know a number of colloquies this morning have come up with on what about when the United States is the only counterparty? And to do this, I think Ms. Neumeister was right not to give the answers you were looking for to those questions, because those answers wouldn't work. So there are two main problems. The first is how to define the market. I think the only truly fair way to define a market is to figure out comparators, because whether we're only going after immigration detention or whether we're going after all detention depends on what we do. This law talks about immigration detention, but our submission is we've already restricted and disallowed private general criminal detention. And if we're right about that premise, then the market looks really different than if I'm wrong about that  And that gets to my broader point. The U.S. being the only counterparty or not is a discrimination question. It's not really a direct regulation question, because as the colloquies with the United States showed today, all of their arguments apply with equal force to neutral state laws and have to apply with equal force to neutral state laws, because that's the whole point of having a direct prong that's separate from a discrimination prong. And so a law that says no detention is allowed for direct regulation, no private detention is allowed for direct regulation, the U.S. would make all the same arguments and have to make all the same arguments because it would be just as direct on the United States when they want to hire an immigration contractor as when they don't. And then that leaves, it's a ban. So don't decide, government functions, U.S. is the only counterparty, it's a ban. And I think Judge Krause, some of the colloquies you've brought up today show that the it's a ban doesn't quite work for two reasons. One, you can call something a ban, but as you've noted it's also just calling it curtailing discretion. If one option that DHS would use to detain immigrants is off the table, that you can define it as particularly a ban, but we didn't ban immigration detention, so you could redefine it as affecting the options available to the United States. You also noted it's very hard to draw the line between what's a ban and what's just incredibly expensive. The United States could continue with immigration detention. I am not disagreeing it would be very expensive, buy the facility, lease the facility, or they included record evidence on how long it would take to build a new facility. So I don't fight any of that. But the point is, if everyone says costs are not enough, but a ban is enough, the problem with a ban is how expensive it is to get around the ban for the United States. So I think it again sort of collapses at the end of the day, this ban isn't really a coherent legal line. The way to suss out bans that don't work is to make sure that the states are willing to take their own medicine and actually restrict it for everyone. Our submission is we are here. There's a fight about whether they're discriminating or not. So it was obviously assumed we're not in the district court, but for direct regulation, we're assuming that we acted neutrally and took our own medicine. And so that's a way to protect against this ban problem. And I would say the inverse point on anti-commandeering, I think is a meaningful one here, which is if the United States banned all private detention neutrally, I don't think we would get to say that's anti-commandeering. It was just, they passed a law that said, Steve, you may not procure private detention. We would have a huge problem. And Judge Bevis, you might call that formal, but that is what our law develops in dealing with these problems, that sovereigns can't regulate each other. This is our constitutional order. They share jurisdiction over private parties and preemption reconciles the two. So I don't think ban holds on the 10th amendment side. I don't know why it would hold on the intergovernmental immunity side. And that brings me to the final two points with thanks, especially to Judge Krauss for being so indulgent of my time today. First is to say, it's true that preemption is becoming a higher bar. That's come up from questions from all of the panelists today. And I will spot you that. I think it is. And I think that matters to this case. But the reason it's becoming a higher bar is because the Supreme court has put a premium on the choices Congress is making. Federal laws are supreme. And so you need to make sure this was really Congress's choice that the state is being an obstacle to. But if we're raising the bar on one side to what is Congress's choice, it seems very weird to rate, to lower the bar on the other side to make sure there's still space for executive preferences that warrants Congress's explicit choice to Trump state law. And so it just seems to me that it's not like a gas where it has to move from one to the other. The point of what happened in preemption is directly applicable to the arguments today in intergovernmental immunity and to the who decides question. Congress can deal with all of these line drawing problems through policy and practical determination that don't require legal tests to resolve all of them for all times. That's not how Congress has to decide, but this court would be in a terrible position. And I close where the United States did, which is the United States does get to work with private parties in some instances, but when it does, it takes the good with the bad and the good are the benefits of privatization, but the costs are very much that they're hiring private parties in our states who are subject to our laws. And if those private parties are going to get around our laws that are non-discriminatory and that are applied directly to the private party, what they need to do is go to Congress and have that preempted 1231 G and they're implementing regulations, doesn't do it. And we don't just move that energy into immunity when they don't have it from Congress. Thank you. We thank all parties for excellent arguments today. That is complex, very interesting case. It's a, it's a pleasure to have everyone so prepared and very helpful to the court. So we, we, yes, we are, we've requested transcripts and the cost of disclosures for the parties and we will be adjourned for today. Thank you.